## WATTS & BROTHER *vs.* THE SAVANNAH & OGEECHEE CANAL COMPANY.

An incorporated canal company whose business is to maintain and keep open a waterway for the use of the public, taking tolls for such use, and having, at or near the terminus of the canal, basins for the accommodation of its customers, with a usage or regulation that timber which lies in the canal, or in the basin, for more than fifteen days after the transportation is completed, shall be subject to an additional charge at a fixed rate per month, is not liable, in the absence of special contract, for the exercise of any care or diligence in guarding or protecting the timber, beyond keeping the canal and basins in good order; and if from rafts lying in the basins or in the canal itself, sticks of timber be lost at any time, by theft, sinking, or otherwise, without some wrongful act on the part of the company or its servants (the burden of proving which is on the owner), the company is not answerable for the damages.

Canals. Tort. Contract. Damages. Before Judge HARDEN. City Court of Savannah. May Term, 1879.

Reported in the opinion.

J. R. SAUSSY; P. W. MELDRIM, for plaintiffs in error.

R. E. LESTER, for defendant.

Watts & Bro. *vs.* The Savannah & Ogeechee Canal Co.

BLECKLEY, Justice.

The declaration alleges that the defendant is a corporation of this state, having its principal place of business in the city of Savannah, and has damaged the plaintiffs two hundred dollars ; that the defendant was and is engaged in the business of canalage, affording, by means of its canal, transportation from the river Ogeechee to the river Savannah, and to and from intermediate points, charging and receiving certain tolls ; that it has attached to and connected with its canal certain ponds used as booms, for the safe-keeping and custody of such timber as may be delivered to it, charging and receiving compensation for the boomage or safe-keeping ; that the plaintiffs, in the year 1876, on divers days (specifying them) delivered to it certain described timber of the value of $106.37, for safe-keeping in said booms ; that by reason of the carelessness and negligence of the defendant, its agents and servants, said timber has been wholly lost to the plaintiffs ; and that "the said defendant, though often requested, has refused and still doth refuse to deliver to your petitioners the said timber or any part thereof, or to pay the value thereof ;" wherefore process is prayed, etc.   The defendant pleaded not guilty, and " *ultra vires.*"

At the trial, the court, on motion of the defendant, ordered a nonsuit, holding the plaintiffs' evidence insufficient to make a *prima facie* case for recovery.   Whether or not this adjudication was erroneous, is the question made by the writ of error.

One of the plaintiffs testified to the description, ownership and value of the timber lost.   It constituted a part of three rafts brought to Savannah over the defendant's canal, one of which was left in the canal and the other two were placed in the basins.   No arrangement for care and custody was made between the parties.   The defendant has nothing to do with the transportation of timber over the canal, except to keep the canal and locks open, the care and

custody during transportation being in the owners. No receipt is given by the defendant. Its custom is to allow the timber to remain fifteen days without charge, and after that time to charge for dockage at the rate per month of twenty cents the M feet. Timber, after inspection, is allowed to remain in the canal or may be placed in the basins or artificial harbor, from which it is taken by owners as required, they, by their servants, or the servants of their factors, moving the timber from the basins to and through the locks, and the lock-keeper suffering it to pass on orders which are sent to him by such owners or their factors. Sometimes a whole section is taken out at once, and again only a few pieces. The lock-keeper enters in a book which he keeps, an account of all timber that passes the locks. The timber in the rafts of which the sticks now sued for formed a part, became loose, and the witness had it brought together and staked, and the president of the Canal Company allowed him twelve dollars for expenses incurred in so doing. The rafts remained in the canal basins until after the yellow fever of 1876, and dockage at the usual rate was paid to the company upon all except the lost timber. When the rafts were sold and ordered out, seven sticks could not be found. The witness does not know what became of them. The president of the company promised to settle for them, but never did so. The price charged at other booms is fifteen to twenty cents the M. feet per month and they, too, do not receipt for timber.

A clerk of the plaintiffs testified that the basins are from 150 to 300 yards from the lock-house where the lock-keeper resides. Upon the arrival of timber near the lower lock, it is regularly inspected by sworn inspectors, who give the lock-keeper the name of the owner, number of pieces, and the dimensions, and he makes entries accordingly in his book; it is by this means that he knows what to charge and from whom to collect. Timber is put in the basins, sometimes by the owners, sometimes by the canal company. No receipt is required or given. An order is given to the

lock-keeper to pass through the locks and the timber is so passed per order. One of the three rafts of the plaintiffs was put in the basin by the defendant. The witness saw all the timber a few months before the seven sticks were lost, and it was in good condition. When witness went for it, the lock-keeper admitted that it was short seven pieces according to the entries in his books, and he assisted witness two days in searching for the missing pieces. Timber if loblolly, fat or rotten will sink, but none of this was of such character, and none of it was found in a sunken condition.

Another person, a timber dealer, and familiar with the trade testified, that an account of the timber brought down the canal is given by the inspectors to the lock-keeper. The defendant has control over the location of timber placed in the basins, and the lock-keeper can place it where he pleases. It is usually inspected in the basins, and is cut loose so as to be turned over, and then fastened by pinning the outside sticks, but not securely. The dockage or boomage has been charged and received by the defendant for years on timber remaining over fifteen days in the canal or the basins. The price is about the same as at the river booms. These latter charge 15 to 20 cents per M feet per month. At them there is tide-water, and a watchman is employed, and the timber tied, but in the canal basins there is no tide-water; the banks prevent the timber from getting away or being stolen. It could not be removed except through the locks. There is no watchman at the canal basins—the lock-keeper is about 150 yards from them. Witness has known timber passed through the locks by mistake—that is, the timber of one party was allowed to pass as the timber of another—such taking was by the servants of the factor who had the sale of the timber. The canal company has nothing to do with the custody or control of timber while it is being transported over the canal.

Did this evidence make a case? We think not. Accord-

ing to the charter of the canal company, *Dawson's* Comp.,
90, *et seq.*, and amendments thereto, acts of 1831, p. 200,
of 1837, p. 214, of 1847, p. 141, of 1849–50, p. 208, the
business of the corporation is to maintain and keep open a
water-way for the use of the public, taking tolls for such
use.   In the light of the charter and of the evidence, the
company is not a carrier; it is not engaged in the business
of transportation; it furnishes nothing but the water upon
which the commerce of the canal floats; its servants render
no assistance in the actual work of navigation; and it as-
sumes no custody or control of the property which enters
the canal and passes over or through it.   The basins at the
Savannah terminus are but expansions of the canal proper,
and are evidently intended for the more ample accommo-
dation of customers, since all have a right to their use free
of any charge additional to the ordinary tolls, for fifteen
days, and this indulgence is equally applicable whether the
timber lies in the basins or in other parts of the canal.  The
regulation which subjects customers to a further assessment
under the name of boomage or dockage, in case they fail to
withdraw their property within fifteen days after the trans-
portation is completed, has for its object, most probably,
the clearing away of the commerce which has arrived at
destination, to make room for subsequent arrivals, so as to
keep the canal from choking up.   Without something to
stimulate discharge, those customers who have been served
might render it impracticable to serve, with reasonable ex-
pedition and equal advantage, those who are behind them.
In order to keep the canal open alike to the whole public,
that portion who bring their rafts into port early, must get
out of the way of that portion who come later; and there
can be no doubt that to give each individual the half of a
month, or the twenty-fourth part of a whole year, to move
out, is a very liberal allowance of time.   To furnish mere
water-surface and support during a longer period, on con-
dition that it is paid for at an established rate per month,
does not impress upon the canal the character of a water

warehouse, or make the company a bailee for storage and safe-keeping. The business of the company is exclusively that of road-making and road-mending, and, in the absence of special contract, it owes no duty to customers beyond that of keeping the canal and basins in good order, and open for use. Whether the property afloat is, for the time, stationary in suitable situations, or in motion along the main channel, makes no difference; the legal relation of the company to it is the same in the one case as in the other. The manning of rafts which are moored, or the keeping of watch over the same, is neither more nor less in the line of the company's business than is the like service in respect to those which are making the voyage; and no new duty arises toward such as have become subject to charges on account of continuing to occupy space in the canal or its basins for a longer term than fifteen days after reaching port. The true nature of this further assessment is a graduated toll upon lingering rafts, proportioned to the length of time they respectively enjoy the use of the company's water-way, and somewhat to the extent of water-surface they occupy. For any wrongful act of the company to the commerce of the canal, the company would be liable in damages, whether the property lost or injured was, at the time, in transit or at destination; but the mere disappearance of property from the canal or the basins, unaccounted for, is not evidence of any such act. In the present case, the missing sticks of timber might have sunk, or they might have been stolen and carried away. How they disappeared, or what became of them, is simply an unsolved mystery. One of the witnesses had known instances in which the lock-keeper had, by mistake, suffered timber to pass through the lock, but he did not pretend that he had any knowledge that this particular timber passed out that way. If mistake in the other instances could be detected, no reason appears why it could not also be detected in this, if it had occurred; and to argue from known mistakes that an unknown one has taken place, not simply that it *might*

have taken place, is unsound. There was no evidence that mistakes were habitual with the lock-keeper, or committed with a frequency more than ordinary, or that he was unfit for his position, or below the average in competency. There is no wrongful act of commission or omission on the part of the company even pointed to by the evidence, much less established, in regard to this particular timber. The timber disappeared, was searched for thoroughly and could not be found; the president of the company promised to pay for it, and failed to comply with the promise; these are the facts which bear against the company with most force, and they wholly fail to support the declaration. It would be altogether unwarranted to infer liability from the president's promise to pay, as the circumstances did not justify the promise, and as the president himself seems to have reconsidered it, and declined compliance. The company is not shown to have failed to perform its charter obligations, or to have done any wrongful act, and hence the non-suit was properly awarded.

Judgment affirmed.