[No. 21437. Department One. November 15, 1928.]

*In the Matter of the Estate of* JOHN B. HART, *Deceased.*

ALICE J. HART *et al., Appellants,* v. LEILA M. HART, *et al., Respondents.*[1]

[1]Reported in 271 Pac. 886.

*F. C. Kapp,* for appellants.

*McClure & McClure,* for respondents Morse *et al.*

*Arthur E. Griffin,* for respondent Hart.

MITCHELL, J.—John B. Hart died in June, 1927, leaving a will with a codicil by which, after directing the payment of his debts, he gave all the rest and residue of his property to his sisters, Alice J. and Emma C. Hart. The will recites:

"Whilst no provision is made in this my last will and testament for my beloved wife, Leila, yet I wish to state that this will is executed with her full knowledge and consent."

He was married in 1898. His wife, Leila M. Hart, survived him. At the time of his death he was interested in none other than community property. Mrs. Hart waived her right to act as administratrix of the community property, and requested that decedent's two nephews by marriage, William B. Morse and R. H. Conner, named in the codicil to the will as executors, be appointed. They qualified as such upon an order appointing them by the superior court of Pierce county, where the will and codicil were admitted to probate.

The executors filed an inventory of all the real and

personal property, which upon being appraised was valued at $197,269.46, exclusive of two twenty-five thousand dollar mortgages on two pieces of Seattle real estate. The inventory of the property appraised contained, among others, the following property situated in Pierce county, viz:

"Item 11. A lot in Steilacoom, Washington, appraised at $100;

"Item 12. American Lake upland, appraised at $50,000, being a certain interest, as yet undetermined, in a tract of land of 77.07 acres in Pierce county, Washington; improvements $10,000; land $40,000, $50,000;

"Item 13. American Lake shore lands in front of the American Lake upland, appraised at $260;

"Item 14. G street property, appraised at $8,500, being a certain interest, as yet undetermined, in lots 1, 2 and 3, block 413, Tacoma Land Co.'s Third Addition to Tacoma, Washington."

Thereupon by a petition, which was later amended, Mrs. Hart alleged that the four items of real property above mentioned were her separate property, and prayed that they be stricken from the inventory and withdrawn from further administration, that the executors and beneficiaries under the will be decreed to have no right, title, claim or interest in or to such property, and for further just and equitable relief. The executors, appearing separately, and the residuary legatees, appearing separately, by their several answers put in issue the allegations of the petition.

Upon these pleadings, which are too voluminous to be set out in full, a trial was had resulting in an order and decree denying the petition to strike item 11 from the inventory, but granting it as to items 12, 13 and 14 by striking them from the inventory and withdrawing them from the administration of the estate, and further declaring these three pieces of property to be the sole and separate property of Leila M. Hart. Alice J.

Hart and Emma C. Hart have appealed. The executors, without appealing, have filed a separate brief in support of the appeal of the residuary legatees.

Item 12, the American Lake upland property, and item 14, the "G" street property, were the separate property of Mrs. Hart. She inherited them from her parents, Jonathan J. and Maria L. Westbrook, of whom she was the sole heir. The first of the two pieces was taken by Mr. Westbrook as a pre-emption claim under the Federal land laws. They built a seven-room residence on it and made other improvements upon it. They made their home on the place. The house has been kept in good condition. The "G" street property was business or apartment house property. Mr. Westbrook died in October, 1903, and Mrs. Westbrook died in December, 1904. Their estates were administered separately, but concurrently, commencing the first of the year 1905, John B. Hart acting as administrator of each estate. The two pieces of property were appraised at ten thousand dollars each in the Westbrook estates, and the records show that the estates were indebted in excess of eleven thousand dollars, including a five thousand dollar mortgage on the "G" street property.

Creditors' claims were presented for all of the debts except the five thousand dollar mortgage, and were paid by John B. Hart, administrator, as hereinafter shown. In his final report in Mr. Westbrook's estate, he stated that the total amount of claims presented and allowed was

" . . . six thousand ninety-four and 94/100 dollars, which the deceased left no money whatever to pay; that I have paid out of my own funds, and hold assignments to myself from the said creditors (except city and county for taxes where I have receipts, showing that I have made such payments) for the whole amount of such indebtedness, desiring that no part of

said estate, real or personal, should be sold, but that the estate be distributed to my wife, Leila May Hart, who is the only child and sole heir of the said deceased and his wife.''

The final account and report closed with the prayer:

''Wherefore your petitioner now moves the court that he may be allowed to make distribution as above set forth.''

The decree of distribution in that estate, after stating that all debts had been paid and discharged, was in part as follows:

''It is therefore ordered, adjudged and decreed: That said final account rendered and filed as aforesaid be and the same is in all respects as the same was rendered and presented for settlement, allowed, settled and confirmed and all of the acts and doings of the said administrator as set forth in said account be and the same are approved.

''It is further ordered, adjudged and decreed: That the residue of the estate of the said decedent, both real, personal and mixed, now remaining in the hands of said administrator and any other property not now known or discovered which may belong to the said estate, or in which the said estate may have an interest, be and the same is hereby distributed to the said Leila May Hart.''

The final account and report, together with the prayer and also the decree of distribution in the Maria L. Westbrook estate, were in these respects similar, except that the total amount of claims presented and allowed was $471.

It is argued on behalf of the appellants that, upon the face of the records in the Westbrook estates, and considering the word ''residue'' used in the final decrees of distribution, Mr. Hart or the community of which he was a member became a purchaser or made an investment in the two pieces of property to the extent of the claims assigned to and paid by him. The

decree of distribution procured by him, however, does not say so. Manifestly the word "residue" was used as a substitute for lengthy specific descriptions of the properties, as they appeared in the inventories, that otherwise would have been necessary and that are nowhere set out in full in the decree. In his final reports he alleged the payments made by him, "desiring that no part of said estate, real or personal, should be sold, but that the estate be distributed to my wife, Leila May Hart, etc." And in closing the report he moved that such distribution be made. Upon that report and prayer he took a decree reciting "that all debts of said deceased and of said estate and all expenses of administration, thus far incurred, . . . have been *paid* and *discharged*," and the order was that the property "be, and the same is hereby distributed to the said Leila May Hart."

In our opinion appellants will not be permitted to successfully contend that Mrs. Hart did not take the property free and clear of former debts against it that had been assigned to and paid by Mr. Hart, under whose will the appellants attempt to assert rights. The matter was adjudicated and put at rest by the final decrees in the Westbrook estates.

After these two properties were distributed to Mrs. Hart, October 26, 1906, and down to the date of the death of Mr. Hart, considerable money was spent on them in upkeep and improvements, taxes were paid, and the mortgage on the "G" street property was paid, all directly by Mr. Hart. He was an able, successful lawyer, and during all his married life maintained his office in Seattle. The "G" street property was remodeled in the latter part of 1910 at an expense of forty-six hundred dollars, and has been rented continuously since 1906 at from seventy-five dollars to one hundred and twenty-five dollars per month, much

of the latter portion of that time at one hundred and twenty-five dollars per month. The home property on the lake was improved by the building of summer cottages that returned seasonal rents. All of the rentals from both places, by an understanding between Mr. and Mrs. Hart, were paid to and disbursed by him in the upkeep and improvement of the properties, taxes and interest and in payment of the five thousand dollar mortgage in the latter part of 1910, this plan being adopted to save Mrs. Hart the trouble of business affairs and being more convenient to be handled by him through his office.

The remodeling of the "G" street property and the changing of tenants for that property, together with fixing the amount of rents, were from time to time submitted to and approved by Mrs. Hart. During the twenty-one years it was thus rented it appears, as well as we can understand the somewhat conflicting testimony upon the subject, that the total outlay upon the "G" street property was somewhat in excess of the income, such excess decreasing toward the latter part of that period. It further appears from the testimony that during all of that time Mr. and Mrs. Hart did not consider it community property. Its value now is fifteen hundred dollars less than it was at the time it was distributed to her.

About 1910 Mr. and Mrs. Hart, who had been residing in Seattle, after considerable planning, decided to establish their residence on her American Lake property, and during that and the following year built a residence costing about sixteen thousand dollars, including some three thousand dollars architect fees and commissions. Thereafter this was their home, though he continued his law practice in Seattle. For years, by way of both experiment and pastime, he spent some of his time irregularly in lawyer-like farming on the

place, neither holding the plow nor driving. Such pursuits were diversified. From time to time he tried the raising of fruit, alfalfa and clover, potatoes, chickens, cows and hogs, all with the usual result of failure. He was a good lawyer, but nothing of a farmer. In these enterprises he spent many thousands of dollars, among other things for improvements other than the residence, which other improvements have in late years vanished and become almost forgotten, so that in the appraisal of the property at this time the value of the improvements, including the old Westbrook house, still in good repair, was fixed in the sum of ten thousand dollars. All of his experiments, it appears, met with the approval of his wife, she knowing that he could afford them as relief from the arduous duties of an active law practice.

The appellants contend that these expenditures by Mr. Hart gave the community an interest in the property or the improvements. Respondent contends that they constituted a gift or advancement. A decision requires the mention of some further facts, as follows:

Mrs. Hart was disqualified under the statute from testifying to many things that possibly would have helped her case. The evidence abundantly shows, without contradiction, that their married life was ideal. Being well able to do so, he had spent, with his wife's approval, large sums of money in the care, support, education and foreign travel for and on behalf of his own relatives, and in making his will be gave all of his property to two such relatives, stating in his will that his wife knew of and consented to it. He always spoke of the property as hers by inheritance, whether engaged in social or business conversation.

To a number of friends, from time to time, he stated that the place belonged to his wife and that he had no interest in it. In discussing his affairs with one he

wished to act as his executor, he stated at that time and on other occasions to him that this property belonged to his wife. The witness declined to act as executor, thinking possibly it would interfere with his official duties as judge of the superior court.

To another witness who was an associate in the ownership of business property, in seeking a loan the decedent said he could not offer this property as security, as it belonged to his wife and she did not want to sell it, and on different occasions, in writing wills for this same witness, it being at one time proposed by the witness that a joint will between him and his wife be written, their property involving among others the home place of the wife, Mr. Hart again referred to his wife's property as hers, being inherited from her parents, and said that he could not join with her in that kind of a will affecting her property. He and the same witness, at another time, discussed the idea of building cottages for rent on their respective properties, at which time Mr. Hart said he was building summer houses so that his wife would have an income in case he died, and at another time that eighty thousand dollars had been offered for the property, but that his wife would not take it.

To others he spoke of the property as his wife's old home place and mentioned her sentimental attachment to it as such, and said that personally he thought it the most ideal spot for a home he had ever seen, notwithstanding considerable travel, including a European trip. An employe, in the nature of a superintendent, who worked on the home place for years and who, it appears, continued thereafter in a way to look after the place until Mr. Hart died, testified that on a number of occasions, upon disagreeing with Mrs. Hart about things he was to do, upon his appealing to Mr. Hart the latter always answered that the place was

hers, and to do as she wished. Considerable more of such kind of declarations on the part of the decedent are contained in the record.

Notwithstanding appellants' contention to the contrary, we have no doubt that such testimony was admissible as declarations against interest, not for the purpose of conveying any interest that Mr. Hart or the community had in the property, but as tending to show that it was his intention to advance and use the money for the benefit of the wife's estate, and that it should accrue to her interest. *Plath v. Mullins,* 87 Wash. 403, 151 Pac. 811. That the testimony was entirely sufficient to establish that purpose, we are satisfied.

In *Donovan v. Olson,* 47 Wash. 441, 92 Pac. 276, it was held, in reversing the trial court, that property acquired in the name of the wife after marriage, paid for by money given to her by an aunt and money derived from her personal earnings presumably before marriage, was her separate property. Answering a further contention in that case, it was said: "If we assume that the deceased husband performed some labor in fencing and making improvements on the land this would not change its character." If the performance of labor of that kind would not work a change, it is difficult to see how the furnishing of money to pay the total cost of fencing and other improvements would.

Under the subject of Husband and Wife, 31 C. J. § 1123, it is said:

"As a general rule, when the separate funds of the other spouse or the community funds are expended in improvements on the separate property of one of the spouses, the title to the improvements follows the land, in the absence of any specific agreement to the contrary, the equities of the parties being balanced by

mutual credits and debits between the several estates involved. Improvements made upon the separate property of the spouse with the use of his separate funds are separate property.''

There is abundant authority in support of the rule. Some of the cases are as follows: *Carlson v. Carlson,* 10 Cal. App. 300, 101 Pac. 923; *Shaw v. Bernal,* 163 Cal. 262, 124 Pac. 1012; *Bullock v. Sprowls,* 93 Tex. 188, 54 S. W. 661; and *Lombardi v. Lombardi,* 44 Nev. 314, 195 Pac. 93. As stated in the case last cited:

''The doctrine deducible from these, and from numerous other authorities that might be cited, is that, where no agreement has been made, 'it must rather be presumed that it was the intention of the husband to advance the money paid for the benefit of the wife's estate, and that it was intended to accrue to her interest.' *Carlson v. Carlson,* 10 Cal. App. 300.''

The rule has been adopted in this state. In *Sackman v. Thomas,* 24 Wash. 660, 64 Pac. 819, this court said:

''When the fact is once established, that when the property was acquired it was separate property of the wife, the presumption will be, in absence of evidence to the contrary, that houses placed thereon, through money derived from the husband, are also the separate property of the wife. The testimony in this case shows that Mr. Sackman was the owner of a large amount of unincumbered property, that he was liberal in giving money to his wife, and, though he acquired a large amount of property after his marriage, the two lots in controversy were the only property conveyed to his wife. It is not unreasonable to presume, independent of the testimony of the wife, that the $700, part of the purchase price, and the $5,000 to build the houses on the lots, were a gift from the husband to the wife, and that a husband situated as Mr. Sackman was would make such a gift to his wife.''

A great many of the Washington cases upon this general subject have been referred to in the briefs,

which we must forbear analyzing. They arose under a vast variety of facts.

The brief on behalf of the executors says that a clear expression of the rule they contend for is found in the case of *In re Carmack's Estate,* 133 Wash. 374, 233 Pac. 942, and in appellant's brief it is claimed that the *Carmack* case overruled the case of *Sackman v. Thomas, supra.* Certainly the *Sackman v. Thomas* case was not overruled in so many words; it was not even referred to in the *Carmack* case. The facts in it were substantially different from those in the *Sackman* case. Counsel rely on our consideration of what was called the Togo property in the *Carmack* case. Carmack acquired that property in consideration of twenty-five hundred dollars in 1898. He married in 1900, and conveyed the property to his wife in 1901. Thereafter a large building was erected on the lot, and the trial court found the property to be worth about fifty thousand dollars. The improvements were made with either community or his separate funds; it was mortgaged, each member of the community executing the note and mortgage; and "it was managed by Mr. Carmack as community property," that is, for a period of twenty-one years he managed it as such, he having died in 1922. The community was held to have an interest in the improvements. Clearly that was an investment or business venture and they so intended it.

In the present case there was no business venture or investment. They simply improved the home Mrs. Hart had inherited, to make a suitable place to live. He not only did not attempt to mortgage it, but declared that he could not pledge it as it was her property. He did not manage it as community property at all, but on the contrary for twenty-one years treated it as her separate property, and on all possible or reasonable occasions declared it to be her separate prop-

erty. As was said in *Lanigan v. Miles,* 102 Wash. 82, 172 Pac. 894, he conducted "himself with reference to the property as to evidence no interest in it"; that is, of course, as to the title.

The case of *In re Finn's Estate,* 106 Wash. 137, 179 Pac. 103, cited by appellants, has no important bearing upon the present case. That case involved the question as to whether the status of property is to be fixed as of the time of its acquisition, or determined by the nature of the funds which ultimately paid off the obligations originally incurred to acquire the property. It was held that the question had already been decided by us in former cases, the rule of which was applied in the *Finn* case. The doctrine of the *Sackman v. Thomas* and kindred cases, which we think applicable to the present case, was not adverted to in the *Finn's Estate* case.

These cases, as they arise under our community property law, must be determined upon their peculiar facts and that law. Often, as here, the decision must rest upon the conduct of the parties, with reference to the property, by whom it was acquired, the purpose of changes or improvements and the purpose and intentions of the parties. In this case, to hold that the community acquired any interest in these properties under the facts and circumstances disclosed by the evidence, would be altogether at variance with the whole history of the married life of Mr. and Mrs. Hart. It would be opposed to every declaration of his from the time of his report and the decree taken by him in the settlement of the estates of his wife's parents, thence on through the rest of his life. There seems to be no doubt of his intention, not only by uniform and undeniable inferences, but also by positive declarations, that the properties she inherited were distributed to her as her separate property and continued to be such.

The shore lands of the second class, being item 13, appraised in this estate at two hundred and sixty dollars, were purchased from the state in 1911 in the name of Mrs. Hart, upon her application under her statutory preference right as an upland owner, in consideration of $260.04. There is no proof that the shore lands were ever used, fit to be used or intended to be used, except in connection with and as a part of the home place. It appears that Mr. Hart thought she already owned the shore lands. Upon learning she did not have title to them, they were purchased for her. The superintendent on the place, speaking of the deceased with reference to this matter, testified:

"He stated that Mrs. Hart had been worrying about the shore lands to the lake and he was sure they were all right and that the title was clear, but, in order to pacify her, he had gone and bought them again, which he considered buying them twice, and gave them to her. He said, 'Here, Dolly, you can take them now and you won't have to worry about them any more.' That was his conversation."

The relations of the parties, the histories and relative situation of the shore land and upland properties and all the facts and circumstances connected with the transaction convincingly show, in our opinion, that the shore lands were intended to be and are the separate property of the respondent. The case in this respect altogether is similar in principle to, and in our opinion stronger upon the facts than, the wedding anniversary gift of real estate by the husband involved in the case of *Nixon v. Post,* 13 Wash. 181, 43 Pac. 23.

Affirmed.

FULLERTON, C. J., BEALS, TOLMAN, and HOLCOMB, JJ., concur.