## COMMISSIONER OF INTERNAL REVENUE v. BURKE et al.*

### No. 6746.

Circuit Court of Appeals, Ninth Circuit.

Nov. 28, 1932.

---

*Rehearing denied January 16, 1933.

Peters, Evans & McLaren,. Robert H. Evans, William G. McLaren, and John J. Jamison, all of Seattle, Wash., for Burke and Seattle Title Trust Co.

Before WILBUR and SAWTELLE, Circuit Judges, and NORCROSS, District Judge.

SAWTELLE, Circuit Judge.

This appeal is from a decision of the United States Board of Tax Appeals, declaring deficiencies in the income taxes of the respondents and cross-petitioners, hereinafter called the taxpayers, for the calendar year 1924 of $969.96, and for the period between January 1, 1925, to December 4, 1925, of $777.87.

The question presented for determination here is whether the income from the Empire Building, in Seattle, Wash., was the separate property of Thomas Burke or the community income of Burke and his wife.

The material facts, which are not disputed, were found by the Board to be as follows:

In 1878, Burke, then a single man, purchased at sheriff's sale a lot in Seattle. At that time Burke had but little money, and was preparing to be married in the near future. His fiancée gave him $500 to apply on the purchase of the property. With this fund, and with $800 borrowed from a banker, he paid the purchase price. of $1,250. The loan of $800 from the banker was paid off by Burke in monthly installments of $20 each.

In 1879 Burke and his fiancée were married at Seattle, where they continued to reside until the marital relation was terminated by Burke's death on December 4, 1925. At the time of his marriage, Burke had practically no property except the lot that. he had purchased at sheriff's sale. At the time of his purchase of that property, it was improved with a small frame dwelling house of a story and a half. This frame dwelling was razed in the year 1897, the lot was excavated to the street level extending back for 25 feet, a one-story brick store building was erected on the lot, and the. frame building was set over it. The cost of this improvement was $6,500. No substantial changes or alterations to these improvements on the lot were made until 1906, when they were removed and a modern reinforced concrete office building was erected on the lot and completed in 1908, at a cost of $392,742. The lot, exclusive of this improvement, had a value of $210,000 dur-

G. A. Youngquist, Asst. Atty. Gen., Sewall Key, Wm. Cutler Thompson, and P. J. Jackson, Sp. Assts. to Atty. Gen. (C. M. Charest, Gen. Counsel, and F. L. Van Haaften, Sp. Atty., Bureau of Internal Revenue, both of Washington, D. C., of counsel), for Commissioner of Internal Revenue.

ing the years 1906–1908. During 1924 and 1925, the building bore the same proportionate value to the lot without the improvements thereon, as during the period from 1906 to 1908.

Burke, after his marriage, received a substantial income from the practice of law. This income, together with the rentals from the Empire building property, the properties he acquired after marriage, the dividends on stocks and the proceeds from the sale of securities, and all other income, were deposited into one checking account in a Seattle bank. The funds from this checking account were used to pay the $6,500 expended in 1897 for the improvements on the Empire building lot. The funds accumulated in this account, together with the credit obtained from short-time loans at the bank, and the proceeds from a $150,000 note and mortgage signed by Burke and his wife, mortgaging the Empire building property, were used to pay all of the cost of $392,742, expended for constructing the office building.

The net rentals received by the Empire Building up to 1925, inclusive, amounted to $642,273.60. These rentals are computed without making an allowance for interest paid on the mortgage indebtedness on the property. During the period from 1907 to 1925 Burke received net rentals from other properties, which had been acquired subsequently to his marriage, aggregating $1,075,552.42, and these rentals were deposited in the aforesaid checking account.

All the income derived from the Empire building property was included by Burke as a part of his general income in making his returns for income tax purposes since 1913, and he always reported the income from his property in the same manner as the income from the other properties referred to above, which had been acquired since his marriage.

In Burke's will, dated November 3, 1925, he expressly "confirmed" "the absolute title" of his wife's one-half of all his property, which he describes as community property. The probate court, under the jurisdiction of which Burke's estate was administered, entered a decree approving the final account of the administrators, which decree stated "that all of Burke's property coming into the hands of the administrators as set forth in their inventory and supplementary inventory filed herein, was declared by the will of said deceased, and is the community property of the said deceased and Caroline E. Burke, widow of the deceased."

Upon a review by the Commissioner of Internal Revenue of the income tax returns for the calendar year 1924 and the period from January 1, 1925, to December 4, 1925, the Commissioner determined that the entire income from the Empire building property was separate income, and should be so reported by the estate of Thomas Burke. The Board of Tax Appeals determined that the income from the Empire building property in 1924 and 1925 that was attributable to the land represented the separate income of Burke, and the income attributable to the improvements represented the community income of Burke and his wife.

Petition for review was filed by the Commissioner on October 6, 1931, and a cross-petition for review was filed by the taxpayers on October 19, 1931.

It is almost axiomatic in the law that title to property is fixed at the time of its acquisition. This rule has been adhered to by the Supreme Court of the state of Washington in an unbroken line of decisions:

"But the real question here is, in whom is the title now vested? The property was acquired in 1905 in exchange for separate property of respondent Olson, and we must hold that title was then vested in him alone and by that conveyance the community obtained no interest. We have said in a long line of cases that the status of real property is fixed as of the time when it was acquired. Our previous holdings to that effect, fourteen cases in all, are cited in Re Brown's Estate, 124 Wash. 273, 214 P. 10, and since that time we have continued with unbroken regularity to recognize the principle. Riverside Finance Co. v. Griffith, 140 Wash. 322, 248 P. 786; Norman v. Levenhagen, 142 Wash. 372, 253 P. 113; In re Williams' Estate, 145 Wash. 19, 258 P. 851. See, also, In re Hart's Estate, 149 Wash. 600, 271 P. 886. This is a wholesome rule and we cannot now depart from it." Rawleigh Company v. McLeod et al. (1929) 151 Wash. 221, 224, 275 P. 700, 701, 64 A. L. R. 238. See, also, Merritt et al. v. Newkirk et al. (1930) 155 Wash. 517, 522, 285 P. 442.

In the instant case, there is no doubt that the lot was the separate property of the decedent, Burke, at the time that he acquired it. The stipulation of facts sets

forth that he "purchased" the land in 1878. He was married in 1879. Obviously there was no community in existence at the time Burke purchased the lot; and, under the general law, which, as we have seen, has been steadfastly followed by the courts of Washington, 'the separate character of the property became fixed as of 1878, the date of its acquisition.

The fact that his fiancée, a year before their marriage, "gave" Burke some money to help him pay the purchase price of the lot did not convert its essential separate character into community. Mrs. Burke testified that the decedent did not "borrow" the $500, but that she "gave" it to him. There is no evidence which would warrant the taxpayers' contention that this "gift" was an "advance" which gave rise to a "resulting trust." The gift was unconditional; hence, as Mrs. Burke testified, she "had hard work to make him take it." Had there been contemplated a business arrangement, i. e., a resulting trust, her fiancé would not have hesitated to enter into it. His reluctance was clearly due to his disinclination to accept an outright gift of money from his fiancée. This is clearly established by Mrs. Burke's own testimony.

Nor are we impressed with the taxpayers' argument based upon the fact that "the remaining sum of approximately $800.00 was * * * repaid, not by him before his marriage, but by the two of them after his marriage out of their then meager earnings at the rate of $20.00 per month." The general rule above referred to, which the many Washington decisions recognize, effectively disposes of the contention that the lot itself was or ever became community property.

But the taxpayers, after fully arguing this point, assert that "the real issue, however, is narrower, namely, the title to the *income* from this property." In this regard, the taxpayers contend that "the value of the improvements, amounting to over $390,000.00, placed upon this lot by the community, the funds for which were in part raised by both members signing a note and mortgage for $150,000.00, is sufficient to give the community at least a proportionate interest in, if not the entire title to, the property."

Here again, however, we find that the position taken by the taxpayers is contrary to the general law and to the most recent decisions of the Supreme Court of the state of Washington. Some of the earlier decisions cited by the taxpayers seem to sustain the taxpayers' contention, but we are bound by the later and emphatic expressions of the state court.

In 31 Corpus Juris, § 1123, at pages 34, 35, we find the following statement of the general law: "Improvements. As a general rule, when the separate funds of the other spouse or the community funds are expended in improvements on the separate property of one of the spouses, the title to the improvements follows the land, in the absence of any specific agreement to the contrary, the equities of the parties being balanced by mutual credits and debits between the several estates involved."

In McKay's "Law of Community Property" (2d Ed.) we find the following language: "§ 342. *Fixtures, Increase and Improvement.* Whatever is attached to a thing, as a fixture, or an improvement, or is incorporated into it by accretion or confusion, takes the character as separate or common of the thing to which it is attached. The date of the acquisition of the added thing does not determine its character, nor does the consideration given for it, but the character of the thing to which it is added determines its character.

"§ 347. *Improvements on Land.* Such improvements are incorporated into it, and follow the title to it. They are not a thing apart, nor does the making of them create any form of title or interest in the land. This is the rule of both the civil and the common law. The character of the land as separate or common determines the ownership of the improvements.

"The circumstances which give rise to a right to have compensation for making improvements is considered at length in another place." [Chapter 16.]

"§ 1013. *The Improvement of Land Passes No Title to the Property.* The common law and the civil law authorities are in complete accord that the improvement of land passes no form of title to it or interest in it. The utmost the improver can successfully claim is compensation. There [are] some dicta to the effect that the improvement of land imposes a lien upon it to secure compensation, but the weight of authority is against this doctrine."

The Act of November 14, 1879 (General Laws of Washington for 1879, p. 77), provides that "all property owned by the husband before marriage and that acquired by him afterwards by gift, bequest, devise, or descent, *with the rents, issues, and profits thereof,* is his separate property." Section

6890 of Remington's Compiled Statutes of Washington 1922, vol. II, sets forth that "property and pecuniary rights owned by the husband before marriage, and that acquired by him afterward by gift, bequest, devise or descent, *with the rents, issues, and profits thereof*, shall not be subject to the debts or contracts of his wife," etc. (Italics our own.)

In Rawleigh Co. v. McLeod, supra, at pages 224, 225, of 151 Wash., 275 P. 700, 701, this entire question is fully treated by the Supreme Court of Washington. That decision so thoroughly and effectually disposes of the present contention of the taxpayers that we quote from it in extenso:

"But it is contended that in Re Carmack's Estate, 133 Wash. 374, 233 P. 942, we held that the community by improving the separate realty of one of the spouses became an owner in proportion as the community funds increased the value of the whole. We think that is not a correct estimate of the holding. It was there said:

" 'This situation would unquestionably give the community a large interest in, but not the entire ownership of, the property, because there can be a segregation of the community interest from the separate interest of Mrs. Carmack. The bare lot was hers, the improvements thereon belonged to the community. * * * We therefore hold that Mrs. Carmack had an interest in this property which is her separate property, yet much the larger interest belongs to the community. It is impossible, of course, to physically segregate the separate from the community interest. It is therefore necessary that the whole of it be put into the hands of the administrator for administration. It is probable that the administrator should ultimately be required to account to Mrs. Carmack according to her separate interest.'

"In speaking of the community interest the court did not mean title, but was looking to the equities of the case, probably having in mind that on the death of one of the spouses and the probate of his estate an equitable lien in favor of the community could be recognized and adjudicated. In the recent case of In re Hart's Estate, supra, the community advances were held to be a gift to the wife, but there is in that case no denial of the principle that if there was no such gift the community might have, by such advances, acquired an equitable lien.

"However, that question is not now before us and will be left for decision when presented. We hold that the title, when taken, vested in respondent alone as his separate estate, and, since there has been no conveyance by Olson or by operation of law, the title still remains in him and subject to the lien of the judgment in its proper order. What that order may be, whether it is preceded by an equitable lien in favor of the community, by homestead rights, or other liens and incumbrances, can all be determined if, and when, such prior rights are asserted at any time before sale on execution, or perhaps, as to some, afterwards."

Again, in Merritt v. Newkirk, supra, an even more recent decision of the Supreme Court of Washington, we find, at page 522 of 155 Wash., 285 P. 442, 444, the following clear restatement of the general rule: "The title to property, whether separate or community, is determined as of the date of its acquisition, and the general rule is that, when community funds are expended in improvements on the separate property of one of the spouses, the title to the improvements follows the title to the land. Unless, therefore, there is a specific agreement to the contrary, or the equities of the case require a different conclusion, the ownership of the property is not changed."

In the early case of Donovan v. Olsen, 47 Wash. 441, 443, 92 P. 276, 277, in an opinion by the late Judge Rudkin, who subsequently became a member of this court, we find the following language: "We think it clearly appears, therefore, that the property was paid for by the appellant out of her separate funds, and that the respondent has no interest therein. If we assume that the deceased husband performed some labor in fencing and making improvements on the land this would not change its character."

Approving the foregoing expression by Judge Rudkin, and extending its application so as to bring it squarely within the facts before us here, the Supreme Court of Washington, in Re Hart's Estate, supra, at page 609 of 149 Wash., 271 P. 886, 889, said: "If the performance of labor of that kind would not work a change, it is difficult to see how the furnishing of money to pay the total cost of fencing and other improvements would."

Finally, in a case brought before it from the United States District Court of Washington, this court already has followed the doctrines outlined above. In Seeber et al. v. Randall et ux. (C. C. A.) 102 F. 215, 218, Judge Ross said: "And, assuming that it is competent for the legislature to declare the rents, issues and profits of the separate property of either spouse to be community prop-

erty, there is nothing in the present bill to take the case out of the general rule, that the skill or labor of either spouse in carrying on farming or other like operations has nothing to do with the question of the ownership of the crops or other proceeds thereof. In such cases, the title to the products grows out of the title to the land itself, and belongs to its owner. [Many cases cited.]"

The taxpayers earnestly insist that "the record shows that all of the income from this property had been continuously treated by the deceased as, and commingled with, all his other community income," that "this would estop him from asserting to the contrary if he were living," and that "it should likewise estop the government." Similar contentions, however, were made in the recent case of Merritt v. Newkirk, supra, and, at pages 522, 523 of 155 Wash. 285 P. 442, 445, the Supreme Court of Washington thus disposed of them: "A third circumstance, thought to show that the home tract was the community property of the husband and wife, were declarations made by the spouses in which they spoke of the property as belonging to both of them. There was also a declaration of homestead filed on the property subsequent to the entry of the judgment, in which the property was described as community property. But these matters do not require a different conclusion from that reached by the trial court. The first mentioned are but common modes of. expression, and have no more than a general bearing where title to property is at issue. The declaration of homestead, while of more moment, was ill-advised and of no effect, and was due evidently to a misunderstanding of the facts on the part of the attorney who prepared and advised it. Whether under any circumstances the filing of a homestead declaration could be regarded as an estoppel, it cannot be so considered in this instance. It in no way affected the rights of the judgment creditor, or caused him to act in a way [in] which he otherwise would not have acted. It has, therefore, no other weight than a declaration against interest, and, as such, it is not sufficient to overcome the positive evidence to the effect that the property is the separate property of the wife."

A precisely identical contention was made in another case from the state of Washington decided by this court, Hatch et al. v. Ferguson et al., 68 F. 43, 50, 33 L. R. A. 759. There, as here, the decedent, in his will, described all his property as belonging to the community. Of the legal effects flowing from such misapprehension, Judge Gilbert said: "It may be conceded that Ezra Hatch believed both his pre-emption claim and his homestead claim to be the community property of himself and his wife, and it is possible that, had he known the nature of his estate in the two claims, he might have made a different testamentary disposition thereof. But the specific devise of all his interest and estate to his children cannot be controlled or diverted by the expression of his belief that the estate so devised was the one-half interest in community property. This opinion was not an admission against his interest so as to estop him or his devisees from thereafter asserting the truth. He may have assumed that he owned an undivided one-half of the pre-emption claim and an undivided half of the homestead claim. If so, he was in error as to both claims, for the pre-emption claim was his separate property, and all of the homestead claim was subsequently patented to Josephine, so that the children took no interest therein under the will. * * * Nor can it be said that third persons, acting upon the faith of such a representation in the will, are misled. There was no specific statement in the will that the pre-emption claim was community property. * * * Neither do we find any warrant for holding, as contended by the appellants, that the provision of the will just quoted is in law a devise upon the part of Ezra Hatch to his wife, giving to her a one-half interest in the land. * * * The reference to the community property tends only to prove that he entertained the erroneous belief that both claims were community property, and that Josephine owned the undivided one-half of each, whereas, in fact, the children took under the will all of the pre-emption claim, and the widow took under the homestead law all of the homestead claim."

Taking into consideration all of the facts in the instant case, as well as the principles of law applicable thereto, as above set forth, we believe that there is no ground for holding that either the Empire building property or the income therefrom belonged to the community. We are of the opinion that neither the decedent's erroneous declarations, in his will and elsewhere, nor the probate court's decree of distribution, if influenced by such erroneous declarations, can alter the general rule of law and the doctrine repeatedly announced in recent decisions of the Supreme Court of Washington. This is especially true in view of the fact that the government was not a party to the proceedings that culminated in the above-mentioned decree of dis-

tribution. We cannot believe that the rights of the government to collect its revenue can be impaired by an ex parte decree of a lower court, when the recent decisions of the highest tribunal in the same jurisdiction compel a contrary conclusion.

Accordingly, we hold that all of the income from the Empire building property of the taxpayer, Thomas Burke, was his separate income, and that the Commissioner of Internal Revenue was correct in his original determination that it should have been so reported by his estate.

The decision of the Board of Tax Appeals is therefore reversed, in so far as it is in conflict with the above holdings.