## HATCH et al. v. FERGUSON et al.

### (Circuit Court of Appeals, Ninth Circuit. May 6, 1895.)

### No. 167.

1. APPOINTMENT OF GUARDIAN—BOND—WASHINGTON STATUTE.

The statutes of Washington provide (2 Hill's Code, §§ 906, 1141, 1142) that a person appointed guardian of a minor must, before receiving letters of guardianship, execute a bond, with sureties. H., by his will, appointed one F. guardian of his minor children. The will made no provision for dispensing with the guardian's bond, but the probate court, by error or inadvertence, entered a decree reciting that F. was appointed, by the will, guardian of the minors, without bond, and approving such appointment. No bond was given by F. *Held*, that such decree of the probate court was void, and F. did not become guardian of the minors.

2. JUDGMENT—COLLATERAL ATTACK.

A suit was brought for partition of land in which the minors had an interest, to which suit F. was made a party as guardian, and in which he alone represented the interests of the minors. A decree of sale was made, and the land sold, and the sale confirmed by the court. The minors subsequently brought a suit to set aside the sale. *Held*, that the decree in the partition suit was void, and both it and the decree of the probate court were open to collateral attack.

3. COMMUNITY PROPERTY—WASHINGTON STATUTE.

H., in 1870, began living with a woman not his wife. In 1873, he located a land warrant, received for services as a soldier in the Mexican war, on land for which he received a patent on January 2, 1874. In 1876, H. was married to the woman with whom he had been living. *Held*, that such land was not community property under the statute of Washington (1 Hill's Code, § 1397) providing that property owned by a husband or wife, before marriage, or acquired afterwards by gift, bequest, devise, or descent, shall be separate property, and property otherwise acquired shall be community property.

4. MARRIAGE—EFFECT OF STATUTE LEGITIMATING CHILDREN.

*Held*, further, that the statute of Washington (Code 1881, § 2388) providing that illegitimate children shall be made legitimate by the subsequent marriage of their parents did not have the effect of making the marriage of H. and his wife relate back to a period before the issue of the patent for the land, though their eldest child was born before the issue of such patent.

5. COMMUNITY PROPERTY—LAND WARRANT.

*Held*, further, that the land patented to H. under a warrant for military service rendered long before the marriage, even if patented after the marriage, would not be after-acquired property within the statute, but was a gift, and so the separate property of H.

6. WILLS—CONSTRUCTION.

The will of H. bequeathed $5 to his wife, and gave all his property, real and personal, after paying such legacy and his debts, to his children, reciting that such property was a half interest in the community property owned by him and his wife. *Held*, that such recital did not estop his devisees from disputing that the land in question was community property, nor amount to a devise of a half interest to his wife.

Appeal from the Circuit Court of the United States for the District of Washington.

This was a suit by Dexter Hatch, Arthur Hatch, Cyrus Hatch, and Ezra Hatch, by their next friend, Josephine Hatch, against E. C. Ferguson, Henry Hewitt, Jr., the Everett Land Company, Judson La Moure, and Minnie E. La Moure to annul a judicial sale of certain land. The circuit court rendered a decree for the complainants. 57 Fed. 966. Defendants appealed. Affirmed.

For a prior opinion on a jurisdictional question, see 52 Fed. 833.

Brown & Brownell, for appellants.

A. D. Warner and Stratton, Lewis & Gilman, for appellees.

Before McKENNA and GILBERT, Circuit Judges, and HAWLEY, District Judge.

GILBERT, Circuit Judge. The complainants in this suit are the minor children of Ezra Hatch, deceased, and devisees of his last will and testament. They bring suit to set aside the judicial sale of their interest in the pre-emption claim of their testator and the decree of partition upon which the same was sold. Ezra Hatch died on the 8th day of July, 1890, leaving five children, to whom he devised all his estate, real and personal, appointing E. C. Ferguson the executor of his will and the guardian of his minor children. He left a pre-emption claim, to which he had acquired patent, and a homestead claim, upon which he and his wife and family had resided for four years. It was believed by the executor that the widow of Ezra Hatch was the owner of an undivided one-half of each claim. In September of the same year the widow made proof upon the homestead claim, and paid the commutation price therefor, but, before patent issued, she gave to E. C. Ferguson a power of attorney to sell all her interest in both claims. On the 21st day of October, 1890, under the power of attorney, Ferguson sold and conveyed to the defendant Hewitt all the right, title, and interest of Josephine Hatch in and to said lands. On the 7th day of April, 1891, Hewitt, having purchased the interest of Esther Hatch, the only one of the children of Ezra Hatch who was of age, commenced, in the superior court of the state of Washington for the county in which said land was situate, a suit against the appellees and E. C. Ferguson, their guardian, for the partition of the pre-emption claim; alleging in the complaint that the plaintiff was the owner of an undivided six-tenths interest therein, and that the appellees were the owners of an undivided four-tenths interest. It was found by the court in the partition suit that the title was as alleged in the complaint, and that the land could not be divided. A sale was accordingly ordered. Hewitt became the purchaser, and the sale was subsequently confirmed by the court. Hewitt thereafter conveyed 10 acres of the land to the defendant La Moure, and the remaining 150 acres to the defendant the Everett Land Company. The circuit court, upon final hearing, found the appellees to be entitled to the relief sued for, ruling that the partition decree and sale were void for the reason that Ferguson was not the guardian of the children, and that Josephine Hatch had no interest in said claim at the time of her conveyance to Hewitt, but that the whole of the claim belonged to the children of Ezra Hatch. These rulings of the circuit court are assigned as error.

By the terms of his will, Ezra Hatch appointed E. C. Ferguson executor, without bonds, and also appointed him the guardian of the persons and estate of the minor children until they should each become of age. It contained no provision by which the guardian's

bond should be dispensed with. Through some error or inadvertence, the probate court understood the will to require no bond of the guardian, and on the 22d day of July, 1890, an order was entered in that court in the "Records of Letters Testamentary and Administration" reciting that Ferguson was appointed guardian of the person and estates of the minor children of Ezra Hatch, without bonds, and concluding thus:

"The said appointment of said E. C. Ferguson by the testator Ezra Hatch is hereby approved, and the said E. C. Ferguson is hereby appointed guardian of the person and estates of Esther Hatch, Dexter Hatch, Arthur Hatch, Cyrus Hatch, and Ezra Hatch."

There is no evidence that letters of guardianship were actually issued to Ferguson. Section 1141 of the Code of Washington (2 Hill's Code) declares that all the provisions of the statutes relative to bonds given by executors and administrators shall apply to bonds taken of guardians. Section 1142 provides that every testamentary guardian "shall give bond in like manner and with like condition as hereinbefore required." Section 906 provides as follows:

"Every person to whom letters testamentary or of administration are directed to issue must before receiving them execute a bond to the state of Washington with two or more sufficient sureties to be approved by the judge."

Without pausing to consider whether, under the laws of Washington, a father may, by his last will and testament, appoint a guardian of children whose mother survives, or whether, by the provisions of those laws, the guardian's bond may in any case be dispensed with, it is sufficient to say of that portion of the judgment of the probate court which declares that by the terms of the will the guardian is not required to give a bond that it is void, whether it be regarded as a recital of fact or a judgment of the court construing the will. The will being absolutely silent upon the question whether or not it was the wish of the testator that the guardian should serve without bond, the probate court had no power or authority to make such finding or enter such judgment. If the authority could be conferred upon the court to make such a finding, it could only be by the words of the testator expressed in his last will and testament. He having failed to confer that authority, there was no other source from which it could come. The probate court, while it is a court of record, with general jurisdiction, acts nevertheless, in the matter of appointing guardians, under a specific grant of power, and exercises a special jurisdiction defined by statute. If the facts do not exist which authorize the action of the court, its action so far is a nullity. Lewis v. Allred, 57 Ala. 628; Seamster v. Blackstock, 83 Va. 232, 2 S. E. 36; Risley v. Bank, 83 N. Y. 318; Windsor v. McVeigh, 93 U. S. 282; U. S. v. Walker, 109 U. S. 258, 3 Sup. Ct. 277, and cases there cited. Said the court in Windsor v. McVeigh:

"The doctrine invoked by counsel, that when a court has once acquired jurisdiction it has a right to decide every question which arises in the case, and its judgment, however erroneous, cannot be collaterally assailed, is undoubtedly correct as a general proposition, but is subject to many qualifications in its application. It is only correct when the court proceeds, after

acquiring jurisdiction of the cause, according to established modes governing the class to which the case belongs, and does not transcend, in the extent or character of its judgment, the law which is applicable to it."

Ferguson gave no bond, but proceeded to act as the guardian of the estates of the minor children, and continued so to act until the commencement of the present suit, which was in February, 1892. In the suit which was brought by Hewitt against the minor heirs of Ezra Hatch and against E. C. Ferguson, their guardian, the latter appeared as the guardian, and, as such represented the interests of the children. The questions arise whether he was such guardian, and whether the partition decree and sale are void on account of his failure to give a guardian's bond. The decisions of the courts concerning the proposition here involved are not in harmony. It has been held in Alabama, Kentucky, Georgia, and North Carolina that the filing of a bond is not essential to the validity of the appointment of a guardian when the same is collaterally attacked. In Cuyler v. Wayne, 64 Ga. 88, the court ruled that the granting of letters of guardianship by the ordinary, without taking bond, would not make the grant of the letters void as against a bona fide. purchaser, who had no notice that a bond had not been given. The statute of that state provided that "every guardian before entering on the duties of his appointment shall take an oath * * * and shall also give bond with good and sufficient surety," etc. In Leatherwood v. Sullivan, 81 Ala. 458, 1 South. 718, the court expressed the opinion that the failure of the plaintiffs to give bond would not render the grant of administration to them absolutely void, but only voidable. Citing Ex parte Maxwell, 37 Ala. 362, and Cunningham v. Thomas, 59 Ala. 158. In Howerton v. Sexton, 104 N. C. 75, 10 S. E. 148, under a statute providing that "every guardian of the estate before letters of appointment are issued to him must give a bond payable to the state," the court held that a guardian who had been duly appointed, but had failed to qualify, could bind his ward by the receipt of money paid by an innocent purchaser as the proceeds of the ward's land, and proceeded to say:

"We are disposed to hold the appointment itself effectual, for it is made in proper form, and the defect lies in the omission to take the bond with surety of the defendant,—an omission not affecting its validity, but subjecting the clerk to the consequences of such neglect."

In Mobberly v. Johnson's Ex'r, 78 Ky. 273, a testator had left a will designating executors, and directing them to sell his real estate. The statute provided that "no guardian can act until he has been appointed by the proper county court and given covenant to the commonwealth with surety." The court said:

"But we consider it immaterial whether the surety is bound on the bond for the proceeds of the real estate sold by the administrator, or whether there was any bond at all. The order of appointment was made by a court having jurisdiction of the person and of the subject-matter, and its judgment cannot be thus collaterally attacked. The executor derives authority to convey from the will. The order of appointment and qualification is the evidence of his authority to act."

But the reverse of these views has been held in Wadsworth v. Connell, 104 Ill. 369; Stewart v. Bailey, 28 Mich. 251; Ryder v. Flanders,

30 Mich. 336; Pryor v. Downey, 50 Cal. 388; Guynn v. McCauley, 52 Ark. 97; McKeever v. Ball, 71 Ind. 398; and Wuesthoff v. Insurance Co., 107 N. Y. 580, 14 N. E. 811. In Wadsworth v. Connell, supra, in construing the law of that state (Laws 1872, § 9, p. 470) which required that a testamentary guardian "shall before he can act be commissioned by the county court of the proper county and give the bond prescribed in section 7 of this act," etc., the court said:

"The will in this case does not dispense with a bond, and none being given, and no commission being issued, appellant never became the guardian of the minors. It is but as if the county court should designate of record the appointment of a person as a guardian, and he were never to give bond or receive letters of guardianship. He could not, by such an order, become a legal guardian, because the statute has made a bond indispensable."

In Wuesthoff v. Insurance Co., supra, the court had occasion to construe the statute of New Jersey, which provided as follows:

"Every guardian appointed by last will or testament, which shall be legally proved and recorded, shall before he exercises any authority over the minor or his estate. appear before the orphan's court and declare his acceptance of the guardianship, which shall be recorded, and shall give bond with such sureties and in such sum as the said court may approve of and order, for the faithful execution of his office, unless it is otherwise directed by the testator's will." Revision, p. 762, § 48.

The court said:

"The distinction which, in the construction of statutes, is sometimes made between directory and mandatory provisions, proceeds upon the supposed intention of the legislature and a discrimination between the essential and the immaterial or nonessential provisions of the statute, or where the statute relates to the powers and duties of officers, between those parts which are intended as a mere direction to the officer in the execution of his duties and those which relate to and concern his substantial authority. The exercise by courts of a power to disregard a particular provision of a statute on the ground that it is directory merely is a delicate one, and should be applied with great caution. The intention of the legislature is the cardinal consideration in the construction of statutes, and whether a particular provision is mandatory or directory is to be determined from the language used and the purpose in view. Construing the various sections of the New Jersey statute together, it is plain, we think, that the first section quoted [Revision, p. 464, § 1] was intended to define the general powers of a testamentary guardian, and that section 48 [Id. p. 762] was intended to prohibit and suspend the exercise by a testamentary guardian of the functions of his office until he should signify his acceptance of the office and execute the bond required. Obviously, the object of the legislature in requiring the guardian to give security was the protection of the ward. The legislature was dealing with the interests of a class especially entitled to the protection of the law. It was a wise safeguard to require that a guardian, before intermeddling with the estate of the ward, should give security for its faithful administration, unless the parent dispensed with this precaution. This section is to be construed as if written with the prior section, and, so read, it makes the giving of security a necessary qualification and a prerequisite to the exercise of any authority over the estate of the ward."

Considering the language of the Washington statute, and the purpose which was intended to be subserved by the provision requiring a bond of the guardian before he should assume the duties of his office, we think it the better doctrine to hold that the statute is mandatory, and that the execution of a bond is made the necessary prerequisite to the appointment of a guardian. It was evidently contemplated that in the creation of guardianships two steps, equally

indispensable, should be taken: First, the appointment; second, the giving of the requisite security by the guardian so nominated,— and that the appointment without the bond, and the bond without the appointment, would be equally impotent to create the official relationship of guardian and ward. It is not the policy of the statute to extend to the purchaser at a guardian's sale the protection which in many instances is accorded to the innocent purchaser. The protection of the minor is deemed of the first importance. It is intended that the purchaser of the minor's property shall be placed upon inquiry to ascertain that the antecedent steps have been taken in accordance with the law. It is within the power of all to know whether the person who assumes to act as guardian is in fact clothed with the powers of that office. An inspection of the record in this case would have shown that Ferguson could not lawfully represent the Hatch heirs without first giving a bond, and that he had wholly failed to comply with the law in that regard. Notwithstanding the judgment of the probate court appointing the guardian, and the judgment of the superior court decreeing and confirming the sale, his acts are void, and may be so declared in any court having jurisdiction of the subject-matter and the parties to the suit. To hold that such defects may be taken advantage of only in direct proceedings is to afford but little protection to the ward whose property is being administered. The circumstances which attend and induce the sale continue in most instances until the ward reaches his majority and the guardian is discharged. Until that time it is obvious that the ward has rarely the opportunity to reclaim his property or protect his rights. The evils which it is the policy of the statute to obviate are real, and their existence is aptly illustrated in the case before the court, since it appears from the record that Ferguson, who acted as guardian, but who failed to give the bond required by law, has appropriated to his own use all of the children's money which he received as the proceeds of the sale of their land, and has wholly failed to account therefor.

Our attention is directed to cases in which it has been held that the failure of a guardian to execute the additional bond which in some states is required by statute upon a guardian's sale of real estate will not avoid the sale when collaterally assailed. But those decisions may be said to rest upon principles distinguishable from those involved in the present case. The failure to give a bond, which is by statute made necessary to the creation of the office of guardian, may be considered a jurisdictional defect, which would prevent the nominated guardian from assuming the duties of his office, and the probate court from acquiring, through such guardianship, the control of the ward's estate. The omission of a duly qualified guardian to give the additional bond may be regarded as an irregularity or defect in administering property lawfully under the control of the court and the guardian, and, as such, it would not necessarily avoid the proceedings.

In the decree of partition it was assumed by the court that the pre-emption claim had been the community property of Ezra and Josephine Hatch, and the court adjudged Hewitt, the plaintiff

therein, to be the owner of an undivided six-tenths interest in the land, he having purchased an undivided one-half interest from Josephine, and the one-fifth interest of Esther Hatch as devisee of her father's will. The remaining four-tenths were found to be the property of the four minor children. The further questions arise whether the land was community property, and whether Josephine had any interest therein. It appears that, in 1870, Ezra Hatch began living with Josephine, and, with her, occupied this land. On October 9, 1876, they were married. They continued to reside on the land until Ezra's death, in November, 1886. Ezra Hatch had been a soldier in the Mexican war, and was the owner of a Mexican land warrant, which had been issued to him by the United States for services rendered in that war. On the 7th day of May, 1873, he located the warrant on the land in controversy, and on the 2d day of January, 1874, in pursuance of such entry, he received his patent. The laws of Washington (section 1397, 1 Hill's Code) provide that the property owned by the husband before marriage, and that acquired by him afterwards by gift, bequest, devise, or descent, shall be his separate property; and section 1398 makes a like provision in regard to the separate property of the wife. Section 1399 provides as follows:

"Property not acquired or owned as prescribed in the next two preceding sections, acquired after marriage by either husband or wife, or both, is community property."

Under these provisions of the statute, the land in question was clearly the separate property of Ezra Hatch. The patent itself recites that the warrant was a grant or gift to him for services performed for the government in the Mexican war. Those services were rendered long prior to the marriage. The entry upon the land was made, and the patent was issued, some years before the marriage. It is not shown that the joint efforts of the husband and wife ever in any degree added to the value of the land. It is urged by the appellants that since the eldest daughter of Ezra and Josephine was born before 1873, and the law of Washington (section 2388 of the Code of 1881) provides that illegitimate children shall become legitimate by virtue of the subsequent marriage of their parents with each other, the marriage of Josephine and Ezra in 1876 relates back to 1870, when they began to live together as husband and wife, or, at least, to the date of the birth of the oldest child, thus rendered legitimate. We are unable to give this construction to the statute. The effect and scope of section 2388 is limited to the precise matter therein referred to,—the legitimation of the children. It would be an unwarranted extension of its scope to say that it was intended to affect the property relations of husband and wife, or to create a rule in regard to community property other than that defined in the statutes heretofore quoted. But, even if the marriage of Josephine and Ezra had taken place before 1873, land which was acquired under a land warrant issued at that date for services rendered by the grantee long prior to the marriage would not be after-acquired property so as to come within the definition of community property as expressed in the statute. The warrant was a gift, and, as such, was the separate prop-

erty of the donee, as was likewise the land which was purchased by means thereof.

It is further contended that the expressions found in Ezra Hatch's will concerning this property make it community property, and estop his devisees from now contending that it was not. The language of the will is:

"I give and bequeath to my daughter Esther Hatch, and to my sons Dexter Hatch, Arthur Hatch, Cyrus Hatch, and Ezra Hatch, all my estate, real and personal, of every name and nature whatsoever, owned by me at the time of my death, after paying all my just debts and the admitting this, my last will, to probate, and the sum of five dollars, hereinafter bequeathed to my wife, Josephine Hatch, said estate being a one-half interest in the community property now owned by me and my said wife."

It may be conceded that Ezra Hatch believed both his pre-emption claim and his homestead claim to be the community property of himself and his wife, and it is possible that, had he known the nature of his estate in the two claims, he might have made a different testamentary disposition thereof. But the specific devise of all his interest and estate to his children cannot be controlled or diverted by the expression of his belief that the estate so devised was the one-half interest in community property. This opinion was not an admission against his interest so as to estop him or his devisees from thereafter asserting the truth. He may have assumed that he owned an undivided one-half of the pre-emption claim and an undivided half of the homestead claim. If so, he was in error as to both claims, for the pre-emption claim was his separate property, and all of the homestead claim was subsequently patented to Josephine, so that the children took no interest therein under the will. The result was that the land was substantially divided between the widow and the children. Nor can it be said that third persons, acting upon the faith of such a representation in the will, are misled. There was no specific statement in the will that the pre-emption claim was community property. A purchaser of said land at a partition sale was necessarily put upon inquiry to ascertain the nature of the estate which the testator possessed, and the facts concerning the same. An examination of the patent would have shown that the land was a gift from the United States. Neither do we find any warrant for holding, as contended by the appellants, that the provision of the will just quoted is in law a devise upon the part of Ezra Hatch to his wife, giving to her a one-half interest in the land. There is nothing in the will to indicate a purpose upon his part to devise to her any portion of his interest in real estate. He bequeathed to her the sum of $5, evidently with the intention that, as to her, he should not be deemed to have died intestate. The reference to the community property tends only to prove that he entertained the erroneous belief that both claims were community property, and that Josephine owned the undivided one-half of each, whereas, in fact, the children took under the will all of the pre-emption claim, and the widow took under the homestead law all of the homestead claim.

We find no error in the decree appealed from, and the same is affirmed, with the costs to the appellees.