STATE v. BAUM.

(Filed May 23, 1901.)

1. WATER AND WATERCOURSES—*Navigable Waters—Indictment —Obstructing Watercourses—The Code, Sec. 1123.*

An indictment charging a person with unlawfully obstructing a navigable stream can be maintained at common law, but can not be maintained under The Code, Sec. 1123.

2. WATER AND WATERCOURSES—*Evidence—Sufficiency—Navigable Waters.*

Charge of court that if the jury believed the evidence, the stream was navigable and the defendant guilty of unlawfully obstructing it, was proper, under the evidence in this case.

INDICTMENT against Arthur Baum, heard by Judge *O. H. Allen* and a jury, at March Term, 1900, of the Superior Court of CURRITUCK County. From a verdict of guilty and judgment thereon, the defendant appealed.

This is a criminal action on indictment, charging the defendant with unlawfully obstructing the navigation of a part of Currituck Sound, known as North Sand Cove. One Hampton, a witness for the State, testified as follows: "I know North Sand Cove, which begins on the eastern side of Currituck Sound and runs through the marsh for about one-half to one mile, and runs into the sound again. It has four mouths or openings into said sound. I have measured the water at the western mouth, and at high tide it is two to two and a half feet, and at low tide about one and a half feet in depth. I measured it at middle tide, and it was two feet, and about the same at its other openings into said sound. The mouths are from 140 to 230 feet wide, but it is wider after you get in, and in some places 200 to 300 yards, and about the same depth all through as at the mouths. North Sand Cove, before it was stopped up, was used by citizens of Currituck County for passing and repassing in their boats, when boating, fishing and hunting, from one part of the sound to the other; *the distance was shortened and in rough weather it was safer to navigate.* Boats from 18 to 20 feet long passed through this cove frequently, and I have carried myself on one of them, my nets and 700 to 800 pounds of fish. *It was used by all the people.* The mouths were stopped by posts put across them, driven securely down 18 inches apart and measuring from 4 to 5 inches in diameter—97 of these in one place and 152 in another, and stopped all use of this watercourse by boats. I have heard defendant say he put them there." Another witness for the State testified to the same effect. The defendant introduced no testimony.

The defendant asked the Court to. direct a verdict of not guilty. This the Court refused and charged as follows: "That if they believed all of the evidence in this case and find from the evidence beyond a reasonable doubt that the North Sand Cove is a navigable stream, and further find that the defendant obstructed the stream by wilfully placing posts in same, as testified, then the defendant is guilty, and you should so find."

There was a verdict of guilty and from the judgment pronounced thereon the defendant appealed.

*Robert D. Gilmer,* Attorney-General, for the State.
No counsel for the defendant.

DOUGLAS, J., after stating the facts: We find no error in his Honor's refusal to charge, or in his charge, though the latter is somewhat meager. But as there are no requests for special instructions, we presume that it was intended to present to us the simple question whether such a watercourse, as is described in the uncontradicted testimony, is a navigable stream. We are of opinion that it is, and that the defendant was properly convicted if the jury believed the evidence, the credibility of which was left to them.

This case is very similar to that of *State v. Narrows Island Club,* 100 N. C., 477, except that the defendant does not claim any individual ownership in the bed of the cove. For the reasons stated in that opinion, we do not think that this action can be maintained under section 1123 of The Code, but that it can be sustained as charging a common law offence. That case comes nearer settling the case at bar than any other we can find in the books, and we think is controlling.

There is a vast amount of learning upon the subject of navigable waters, much of which is inconsistent and the greater part of which is totally inapplicable to the physical

conditions of our country.   Under the common law of England, whence came the doctrine, the ebb and flow of the tide was the test of a navigable stream.   Such streams were said to be *publici juris,* but the right of navigation might be *acquired* above tide-water.   This rule operated very well in England, whose small size and low elevation confined actual navigation practically to the theoretical limits fixed by law. Few, if any, of its streams are actually navigable for any practical purpose beyond the flow of the tide.

For a time our courts adhered to the definition of the common law, and found little difficulty in doing so, as this country was then thinly settled, with no towns of any importance above tide-water.   At that time the navigability of a stream depended more upon the temper of the Indians living along its banks than upon its natural features.   As, however, the settlements went inland and important towns were built where tides were unknown, the courts soon found that it was impossible to measure rivers, like the Hudson and the Mississippi, by the rule of the Thames.   The rule was then modified so as to include among navigable streams all rivers as far up as they afforded a free passage for sea-going vessels; and about the same time its practical application was greatly extended by the development of steam power, which enabled vessels to ascend rivers, the swiftness of whose currents had hitherto been a practical bar to navigation.

This rule seems to have been followed for many years in determining the limits of Federal jurisdiction; but it in turn was found insufficient to meet the demands of industrial and commercial growth.   In fact, it did not reach to the Great Lakes, which have but recently become to be regarded in their true light as inland seas, having a law unto themselves.   In contemplation of law, they are for all practical purposes regarded as the "high seas."

An interesting discussion of this subject is given by Chief

Justice Taney, in the case of the Genesee Chief, 12 How., 443, and by Justice Bradley, in *Barney v. Keokuk,* 94 U. S., 324. See also *U. S. v. Rogers,* 150 U. S., 249. The Admiralty rule as now generally recognized, is thus stated in Gould on Waters (3d Ed.), sec. 67: "The ebb and flow of the tide does not now constitute the test of the navigability of American waters, and those rivers are public and navigable in law which are navigable in fact. If, in their ordinary condition, by themselves or by uniting with other waters, they form a continued highway over which commerce is or may be carried on with other States or foreign countries in the customary modes in which such commerce is conducted by water, they are 'navigable waters of the United States' within the meaning of the Acts of Congress in which that phrase is employed." The different States were of necessity compelled to extend this rule to a greater or less extent to their inland streams, and to such coastal waters as are not within Federal jurisdiction. The rule now most generally adopted, and that which seems best fitted to our own domestic conditions, is that all watercourses are regarded as navigable in law that are navigable in fact. That is, that the public have the right to the unobstructed navigation as a public highway for all purposes of pleasure or profit, of all watercourses, whether tidal or inland, that are in their natural condition capable of such use. The navigability of a watercourse is therefore largely a question of fact for the jury, and its best test is the extent to which it has been so used by the public when unrestrained. And yet it would seem that there must be some element of a public highway, and that its navigation must be in some degree required by the necessity or convenience of the public. It should not depend entirely upon the personal whim of an individual. We are not prepared to say that a land owner would be liable to criminal prosecution because he happened to put a water-gate across a creek up

which otherwise an idle hunter might be able to pole a canoe; nor are we now dealing with any right except that of simple navigation.

It appears from the evidence that the public were in the habit of passing through North Sand Cove before it was stopped up, and that by its use the distance from one part of the sound to another was shortened and navigation rendered safer in rough weather. These conditions constitute ample evidence of a navigable stream. Gould on Watercourses, secs. 42, 43, 54, 57, 60, 86; Angell on Watercourses, secs. 537, 541, 550; Wood on Nuisances, secs. 451, 452, 453, 455, 456; *Wilson v. Forbes,* 13 N. C., 30; *Collins v. Benbury,* 25 N. C., 277; same case, 27 N. C., 118; *Fagan v. Armistead,* 33 N. C., 433; *Lewis v. Keeling,* 46 N. C., 299; *State v. Glen,* 52 N. C., 321; *State v. Parrott, supra; Broadnax v. Baker,* 94 N. C., 675; *State v. Narrows Island Club, supra; Hodges v. Williams,* 95 N. C., 331; *McLaughlin v. Manufacturing Co.,* 103 N. C., 100, 108; *State v. Eason,* 114 N. C., 787; *Commissioners v. Lumber Co.,* 116 N. C., 731; *Manufacturing Co. v. Railroad,* 117 N. C., 579; *Staton v. Wimberly,* 122 N. C., 107, 110.

Many of these cases do not involve directly the right of navigation, as they relate principally to other matters, such as the right of entry or fishing, but they all tend more or less accurately to show the distinction in this State between navigable and non-navigable watercourses.

That the obstruction of a navigable stream is a public nuisance is well settled by reason and authority. *State v. Dibble,* 49 N. C., 107; *State v. Parrott,* 71 N. C., 311; *State v. Narrows Island Club, supra;* Wood on Nuisances, secs. 478, 483, 484; Gould on Waters, secs. 91, 92, 93, 94, 140; Angell on Watercourses, sec. 554.

As no error appears in the trial of the action, the judgment of the Court below is affirmed.

Affirmed.